NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

RUBIN J. BROOKS, JR.,         )
          )
    Appellant,       )
          )
v.              )     Case No. 2D16-2105
          )
STATE OF FLORIDA,       )
          )
    Appellee.        )
_____)

Opinion filed May 16, 2018.

Appeal from the Circuit Court for
Hillsborough County; William Fuente,
Judge.

Howard L. Dimmig, Public Defender and
Steven G. Mason, Special Assistant Public
Defender, Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Kiersten E. Jensen,
Assistant Attorney General, Tampa,
for Appellee.


LUCAS, Judge.

Faye Kitchen and Shannon Thomas (a/k/a "Funko") were found dead

inside Ms. Kitchen's home in the early evening hours of November 12, 2011. Police

detectives investigating the scene suspected they had likely been beaten to death, and

the ensuing investigation would reveal a trail of evidence that appeared to implicate Rubin Brooks. In addition to that evidence, the State called a former cellmate of Mr. Brooks who recounted Mr. Brooks offering a late night, confessional prayer about the two victims. Because the circuit court deprived Mr. Brooks of the opportunity to impeach that former cellmate's testimony, we must reverse the final judgments and convictions of first-degree murder and remand this case for a new trial.

Mr. Brooks and Funko had a history of drug transactions with one another in Plant City, the latter selling the former crack cocaine on some occasions, while on other occasions, Mr. Brooks would act as a middleman for Funko. But the two had something of a falling out when Funko put a gun to Mr. Brooks' mouth in what may have been a dispute over money.

A few days later, however, in the predawn hours of November 12, 2011, the two men were together again, taking part in an extended sale of crack cocaine to a third party in a mobile home in Plant City. Having sold all they could, at around 5:30 a.m., they were dropped off at Ms. Kitchen's house in Plant City to make more crack. This was the last time Funko was seen alive. A medical examiner determined that Funko and Ms. Kitchen were likely killed in their sleep inside Ms. Kitchen's home; it was later stipulated that both victims died on November 12, 2011.

A little after 7:30 a.m. that same day, one of Ms. Kitchen's neighbors recalled speaking with Mr. Brooks (Mr. Brooks had helped himself to a bottle of the neighbor's lighter fluid); and shortly after that, Mr. Brooks was seen walking away from a smoking barrel in a neighboring yard. The same witness from whom Mr. Brooks had borrowed lighter fluid recalled Mr. Brooks later approaching him and saying, "Funko

pulled a gun on me and I was scared but I'm not scared anymore."  Another witness, a longtime friend of Mr. Brooks, would also testify that on the morning of November 12, Mr. Brooks was acting "hysterical" and that Mr. Brooks had stated that he and Funko had "had a little confrontation."

Inside the aforementioned barrel, investigators would find a red sweater and blood-stained black pants, a broken knife handle, two dumbbell handles, and a piece of lumber.  A witness remembered seeing Mr. Brooks wearing the same sweater on the night of November 11.  When tested, it was determined that the sweater contained Funko's DNA and a partial profile that included Mr. Brooks' DNA.  As to the knife handle, Funko's body was found with a partial knife blade in his chest; a Florida Department of Law Enforcement crime laboratory analyst conducted a fracture match analysis and concluded that the two parts—the blade and the handle—were at one time a single piece.  The two dumbbell handles in the barrel were shaped in such a way that appeared to resemble the head wounds found on Funko's and Ms. Kitchen's bodies.[1]

The State charged Mr. Brooks with two counts of first-degree murder.  On the third day of his jury trial, after having presented the aforementioned evidence, the State called Edward Thomas as a witness.  Mr. Thomas was a former cellmate of Mr. Brooks while Mr. Brooks was in custody awaiting trial.  Mr. Thomas testified that late one night, while they were bunked together, he overheard Mr. Brooks praying aloud and apologizing to God for what had happened to Ms. Kitchen.  Mr. Thomas, apparently

_____

[1]However, neither the dumbbell handles nor the knife handle were tested for fingerprints.

awoken by Mr. Brooks' praying, engaged in a conversation with Mr. Brooks about the subject of his prayer, which he recounted to the jury:

> And he [Mr. Brooks] said Funko did some fucked up shit
> and, you know I went to — every time I asked him a question
> he would just you know go at his own pace, you know, so I
> just let him have the floor . . . and then he said Funko had
> pulled a gun on him in front of some guys.
>
> . . . .
>
> Q.    Did he ultimately say what he did to Funko?
>
> A.    Oh, yes, ma'am.
>
> Q.    What did he say?
>
> A.    He said he killed Funko.
>
> Q.    Did he say anything about anybody else, a lady?
>
> A.    Yes, ma'am.
>
> Q.    What did he say?
>
> A.    Well, he was just basically saying — well, in a prayer I
> heard him say in the prayer, you know.
>
> Q.    Well, tell us what he said in the prayer?
>
> A.    He was like he was sorry for what happened to the
> lady because she didn't deserve it you know. Like basically I
> felt like he was remorseful what happened with the lady but
> he wasn't remorseful what happened with Funko.

After Mr. Thomas finished testifying, however, Mr. Brooks' counsel learned of another witness, Shawn Keene, who claimed to have some information of his own—about the State's witness, Mr. Thomas. Through a proffer, Mr. Keene testified that he and Mr. Thomas were also former cellmates. And Mr. Keene recalled Mr. Thomas telling him that a member of one of the victims' families had offered Mr. Thomas $2000

to testify that Mr. Brooks committed the murder. Mr. Brooks sought to recall Mr. Thomas to inquire about any offers of money to testify against Mr. Brooks and to present Shawn Keene's testimony to impeach Mr. Thomas.[2] The circuit court, however, ruled that the testimony was inadmissible. With respect to recalling Mr. Thomas, the court reasoned that an attorney cannot call a witness solely for the sake of impeaching him; as to Mr. Keene, the court determined that his testimony was hearsay and the declarant was not unavailable to testify, that it went beyond the scope of testimony elicited from Mr. Thomas, and that the testimony was not a statement against penal interest.

The jury found Mr. Brooks guilty on both counts of first-degree murder, after which Mr. Brooks filed a motion for new trial. In its order, the circuit court acknowledged it had mistakenly excluded Mr. Keene's testimony but nevertheless denied the motion, concluding that Mr. Brooks was not prejudiced by the error because of the overwhelming evidence presented of Mr. Brooks' guilt. In our view, the circuit court correctly identified its error but wrongly concluded that that error was harmless.

First, the excluded examinations at issue here—both Mr. Keene's and Mr. Thomas's—were indeed admissible and should have been allowed. See, e.g., Musson v. State, 184 So. 3d 575, 578, n.4 (Fla. 2d DCA 2016) (explaining that "the hostility of a witness towards a party against whom he is called may be proved by any competent

---

[2]During the proffer, Mr. Thomas testified that he knew Shawn Keene and that they were housed in the same dorm during one of Mr. Thomas's incarcerations. Mr. Thomas portrayed Mr. Keene as being eager to discuss Mr. Brooks' case but that he always brushed off Mr. Keene because he knew Mr. Keene and Mr. Brooks were friends. Mr. Thomas also denied that anyone from the Kitchen or Thomas families approached him regarding his testimony or ever offered him any money to testify against Mr. Brooks.

evidence . . . [including] the testimony of other witnesses" (alterations in original) (quoting Jones v. State, 678 So. 2d 890, 893 (Fla. 4th DCA 1996))); McCoy v. State, 580 So. 2d 181, 185-86 (Fla. 1st DCA 1991) (holding that circuit court's refusal to allow defendant to call detective as an adverse witness to impeach him through use of prior inconsistent statements about a defendant's identity amounted to a denial of due process). Plainly there was error here, and the circuit court recognized it as such. The question this appeal raises is whether the error of the exclusion of this evidence was harmless in Mr. Brooks' case.

> The harmless error test, as set forth in Chapman[ v. California, 386 U.S. 18, 24 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

State v. DiGuilio, 491 So. 2d 1129, 1135, 1138 (Fla. 1986).

To be sure, the State put forth considerable evidence that implicated Mr. Brooks in these murders. But as the late Judge Walden once aptly observed, "There can, of course, be no more damning piece of evidence than a confession by the party charged." McDonnell v. State, 292 So. 2d 420, 424 (Fla. 4th DCA 1974) (Walden, J., dissenting); see also Sciortino v. State, 115 So. 2d 93, 95 (Fla. 2d DCA 1959) (admonishing that "confessions of parties charged with crime should be acted on by courts and juries with great caution"). Here, a witness recounted, at length and in detail, an accused defendant's confession to God for the murder of one victim and a remorseless confession for the murder of another. The confession Mr. Thomas relayed was featured as a point in the State's opening statement and in its rebuttal closing

statement to the jury.  Depriving Mr. Brooks of the only meaningful opportunity to impeach that witness' testimony for alleged bias cannot be deemed harmless under these facts.  See Musson, 184 So. 3d at 579; McCoy, 580 So. 2d at 185-86.

Accordingly, we reverse the judgments and sentences below and remand this case for a new trial.

Reversed and remanded with instructions.

LaROSE, C.J., and KHOUZAM, J., Concur.